# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

───────────────────

№ 15-CV-2673 (JFB)

───────────────────

GENESIS MCALLISTER,

Plaintiff,

VERSUS

CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,

Defendant.

───────────────────

**MEMORANDUM AND ORDER**
September 9, 2016

───────────────────

JOSEPH F. BIANCO, District Judge:

Plaintiff, Genesis McAllister ("plaintiff"), commences this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("SSA"), challenging the final decision of the Commissioner of Social Security ("Commissioner") denying plaintiff's application for disability insurance benefits. An Administrative Law Judge ("ALJ") found that plaintiff had the residual functional capacity to perform "the full range" of sedentary work, of which there were a significant number of jobs in the national economy, and, therefore, that plaintiff was not disabled. The Appeals Council denied plaintiff's request for review.

Plaintiff now moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The Commissioner opposes plaintiff's motion and cross-moves for judgment on the pleadings.

For the reasons set forth herein, the Commissioner's cross-motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is denied, but plaintiff's motion to remand is granted. Accordingly, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order. Remand is warranted because the ALJ erred by failing to explain the weight he assigned to the opinions of plaintiff's treating physician, Dr. Slaven,[1] and failing to properly assess the factors for determining what weight to give those opinions.

---

[1] As discussed, *infra*, on remand, in addition to evaluating Dr. Slaven's opinion according to the treating physician rule, the ALJ should also consider the new evidence submitted to the Appeals Council by Dr. Slaven.

# I. BACKGROUND

## A. Factual Background

The following summary of the relevant facts is based upon the Administrative Record ("AR") developed by the ALJ. A more exhaustive recitation is contained in the parties' submissions to the Court and not repeated herein.

### 1. Personal and Work History

Plaintiff was born on January 22, 1976 (AR at 97), is a high school graduate, and is trained in tax preparation. (AR at 112.) Plaintiff stated she lives with her husband and 4-year-old son. (AR at 129-30.) Plaintiff's work history consists of the following: kitchen manager/waitress from January 2003 until February 2004 (AR at 113), hotel front desk employee and housekeeper from March 2004 until August 2005, supermarket video clerk/cashier from August 2005 until September 2006 (*id.*), tax consultant from September 2006 until January 2007 (AR at 141), and waitress from October 2006 to January 2008 (AR at 113). Plaintiff stopped working in 2008 after becoming pregnant and suffering from impairments. (AR at 112.)

On November 19, 2012, plaintiff completed a "Function Report," which detailed her daily activities, as well as how her condition affected her ability to perform various tasks. (AR at 129-39.) Plaintiff indicated that she "can't lift more than 20 [pounds] anymore," "can't stand for [too] long anymore about 10 minutes," that it "hurts to walk for long periods," that she cannot walk longer than one block before needing to "stop and rest," that she "can't sit for longer than 10 minutes at a time," that it "hurts to climb stairs, . . . kneel, . . . [and] squat," that she has "occasional pain in [her] hands and wrists," and that she has difficulty maintaining concentration and has to "write everything down so [she] can remember." (AR at 134-37.) Plaintiff indicated both of her knees have braces and immobilizers and both of her wrists have braces. (AR at 139.) Plaintiff also indicated that she "occasionally" has difficulty when dressing herself, bathing, and caring for her hair. (AR at 131.) She stated she has to "sit down now to shave [her] legs," that it is "hard to get on and off" the toilet, and that she does not feed herself. (*Id.*)

Plaintiff reported she cares for her 4-year-old son in the following ways: dresses, feeds, and bathes him, drives him to and from school (four days per week), launders his clothes, cooks for him, puts him to bed and plays with him. (AR at 130, 134.) Plaintiff also stated that she cooks all the meals for her family daily but not "big meals" (AR at 131-32), and that she is able to do the "cleaning," "laundry," and "household repairs." (AR at 132.) However, she indicated that she has to "sit to do dishes or fold laundry now." (*Id.*) She also said she needed to rest after an hour or two of doing chores. (AR at 139.) Plaintiff also reported that she shopped once per week and maintained a savings account, but that it was "hard to drive [herself] all the time." (AR at 133.) Plaintiff stated that she watches television "everyday" but "[does not] do social activities anymore" since her conditions began. (AR at 134.)

### 2. Medical History

On March 19, 2012, plaintiff saw Jodi H. Scherpirro, D.O., at Long Island Medical Care Service for an upper respiratory infection. (AR at 299-300.) Plaintiff reported her medications were Ibuprofen and Naproxen. (AR at 299.) At the time, she weighed 220 pounds. (*Id.*) The lung examination was unremarkable and

extremities were normal, with no edema and normal pulses. (*Id.*)

Plaintiff visited Dr. Ben Benatar, an orthopedic surgeon, on March 20, 2012. She reported right knee pain and clicking, as well as lower back pain radiating to her right buttock and thigh. (AR at 324.) She stated she had difficulty kneeling, sitting down, and getting up. (*Id.*) Plaintiff stood erect when examined. (*Id.*) She had limited motion in her lumbar spine and tenderness in her paralumbar muscles. (*Id.*) Dr. Benatar noted that, due to a lower back and right knee injury, plaintiff had reduced mobility with difficulty standing, walking, sitting and squatting. (*Id.*) Consequently, Dr. Benatar recommended physical therapy in addition to a weight loss program. (*Id.*) He concluded that plaintiff had a "marked disability." (*Id.*)

On May 14, 2012, plaintiff returned to Dr. Benatar and complained of pain in her left wrist. (AR at 323, 325.) On examination, the only tenderness in the left wrist was on the dorsum over the distal radius at the radian carpal junction. (*Id.*) Range of motion was "fairly good" and comfortable. (*Id.*) Dr. Benatar indicated that plaintiff should continue to wear a wrist immobilizer brace and take Norco for pain. (*Id.*)

An MRI of plaintiff's right wrist was conducted on May 24, 2012. The results revealed the following: extensor carpi ulnaris tendinosis with an intrasubstance tear; small ganglion cyst of no clinical significance; mild degeneration in the anterior portion of the scapholunate ligament related to an old sprain; and trace distal radioulnar joint effusion of no clinical significance. (AR at 284-87.)

Plaintiff saw Physician Assistant Karen A. Montebello on June 14, 2012. (AR at 297.) The diagnosis was acute pharyngitis. (*Id.*) At that time, she weighed 220 pounds, and her lungs were clear. (*Id.*)

On July 18, 2012, plaintiff consulted Dr. Benatar after suffering from wrist pain, swelling, and difficulty with movement. (AR at 321.) Upon examination, there were 20 degrees of palmar flexion and 30 degrees of dorsiflexion. (*Id.*) Dr. Benatar diagnosed acute synovitis in her left wrist, and referred her to a rheumatologist and for an MRI. (*Id.*)

On July 20, 2012, an MRI of plaintiff's left wrist was taken. The results revealed: focal fluid collection in the extensor carpi radialis brevis tendon sheath consistent with the presence of stenosing tenosynovitis; degeneration at the joint between the trapezoid and base of the third metacarpal with posterior osteophyte formation in a carpal boss configuration; and no evidence of tendon or ligament tears; and mild synovitis. (AR at 288, 290.)

On July 31, 2012, plaintiff told Physician Assistant Montebello that she had pain in both wrists. (AR at 291-96.) She weighed 220 pounds at this time. (AR at 291.) Plaintiff's right wrist was tender without any redness or swelling. (*Id.*) She had diffuse body tenderness. (*Id.*) Physician Assistant Montebello diagnosed: pain in joint, site unspecified; unspecified adverse drug effect; absence of menstruation; and other malaise and fatigue. (AR at 291-92.) She prescribed Naproxen for plaintiff's joint pain and Zoloft for fatigue. (AR at 292.)

Plaintiff subsequently complained to Dr. Benatar, on August 15, 2012, that she had difficulty rising from a seated position, and experienced "clicking, popping, and pain in both knees." (AR at 320.) Plaintiff's left wrist was significantly swollen, tender and warm to touch, with a marked reduction in range of motion. (*Id.*) Dr. Benatar indicated there was

left wrist cartilage destruction on the MRI; he believed "everything is traumatic in nature," but referred plaintiff to a rheumatologist to rule out other possible sources of pathology. (*Id.*) He also renewed prescriptions for Ibuprofen and Norco. (*Id.*)

On September 18, 2012, plaintiff spoke with rheumatologist Prachi Anand, M.D. (AR at 257-59.) Plaintiff stated she had generalized pain "all over." (AR at 258.) She further indicated she had experienced bilateral knee and wrist pain for four years, and arm pain throughout the past one to two months. (AR at 257.) There was no synovitis in the wrists, knees, ankle, or feet. (AR at 258.) There was tenderness in both arms and shoulders. (*Id.*) Dr. Anand diagnosed that plaintiff "likely had fibromyalgia" and prescribed Flexeril. (*Id.*)

Plaintiff told Dr. Benatar, on October 2, 2012, that she had pain in her left knee. (AR at 319.) Dr. Benatar's notes indicate that plaintiff had experienced lower back and left wrist problems in the past, but her main complaint was left knee pain, with clicking, popping, and occasional buckling. (*Id.*) Upon examination, there was tenderness of the patellofemoral joint of the left knee with crepitus during range of motion testing. (*Id.*) Ligaments were stable, but there was marked hypermobility of the patella from the lateral subluxed resting location. (*Id.*) Dr. Benatar diagnosed chondromalacia of the patellofemoral joint of the left knee. (*Id.*) As a result, he instructed that plaintiff do quadricep strengthening exercises. (*Id.*) Dr. Benatar also indicated that a recent MRI revealed degenerative changes in plaintiff's left wrist. Thus, he prescribed a wrist corset and taught plaintiff wrist strengthening exercises. (*Id.*)

On October 12, 2012, plaintiff consulted Waseem Mir, M.D. (AR at 260-61, 307-08.)

Plaintiff stated she had right wrist and right knee pain, which had started four years ago, after giving birth. (AR at 260.) Injections of oral Prednisone had helped heal the symptoms. (*Id.*) She stated that in the last three months she experienced the following: left knee pain, left wrist pain, neck pain, lower back pain, and bilateral shoulder pain. (*Id.*) Her hands were stiff as well. (*Id.*) At that time, plaintiff weighed 230 pounds. (*Id.*) Chest, neck, back, extremities, and neurological examinations were normal. (*Id.*) There was tenderness in the left wrist and left knee pain on motion. (*Id.*) There was no edema, and plaintiff had full range of motion in all joints without any inflammation. (*Id.*) Dr. Mir diagnosed that plaintiff's symptoms suggested psoriatic arthritis. (*Id.*) As a result, he prescribed a Prednisone taper and Plaquenil. (*Id.*)

Plaintiff returned to Dr. Modi on November 5, 2012. (AR at 309-14.) She stated she had joint and muscle pain, but denied joint swelling. (AR at 309.) She indicated she suffered from fatigue, poor sleep, irritable bowel symptoms, and a past history of anxiety. (*Id.*) Plaintiff's motor strength was normal. (AR at 310.) She had tenderness in her elbow. (*Id.*) There was no swelling in her hands, wrists, or shoulders. (*Id.*) Plaintiff had no swelling or pain on range of motion in her knees. (*Id.*) Dr. Modi diagnosed insomnia, raised antibody titer, arthralgias in multiple sites, chronic pain, fibromyalgia, and anxiety disorder of unknown etiology. (AR at 311.) He prescribed Cymbalta, referred plaintiff to pain management, and recommended a daily exercise routine. (*Id.*)

On November 27, 2012, plaintiff indicated to Dr. Benatar that she suffered from pain in both knees, hips, shoulders, lower back, and occasionally in her ankles and wrists. (AR at 318, 383.) Dr. Benatar

4

provided that plaintiff had patellofemoral pain syndrome in her left knee, effusion in both knees, and a very tender wrist. (*Id.*) Plaintiff weighed 225 pounds at the time. (*Id.*) Dr. Benatar took note of plaintiff's recent diagnosis of fibromyalgia, but left the treatment of that condition to her rheumatologist. (*Id.*) However, he prescribed Tylenol and Norco to relieve pain. (*Id.*) He also recommended that plaintiff continue with her exercise program and stretches. (*Id.*)

On December 5, 2012, Chaim Shtock, D.O., consultatively examined plaintiff. (AR at 274-79.) Plaintiff reported a history of the following conditions: asthma since 2002; lower back, right thigh, right knee, and right wrist pain that started in 2008 while pregnant; bilateral knee arthritis since 2009; right wrist carpal tunnel syndrome diagnosed in 2010; fibromyalgia diagnosed in 2010; headaches since 2010; and bilateral wrist osteoarthritis diagnosed in 2012. (AR at 274-75.) At this time, plaintiff complained of lower back, bilateral knee, and bilateral wrist pain. (AR at 274.) Her medications consisted of: Protonix; Ibuprofen, Naproxen, Melatonin, Predisone, Cymbalta, and Norco. (AR at 275.) Plaintiff also noted she smoked one pack of cigarettes per day. (*Id.*) She reported that she did the following activities independently: cooked, cleaned, washed laundry, shopped, showered, dressed, and groomed herself. (*Id.*) She also watched television and listened to the radio. (*Id.*) X-rays of the lumbosacral spine and left knee had negative results. (AR at 276, 278-79.) Plaintiff's weight was 226 pounds at the time. (AR at 275.) She walked on heels and toes without difficulty, and did not need any help changing or getting on or off the examination table. (AR at 275-76.) She did not use any assistive devices. (AR at 276.) Plaintiff could only squat 30 percent due to knee pain. (AR at 275.) Hand and finger dexterity were intact and grip strength was 4+/5 on the right and 4/5 on the left. (AR at 276.) Plaintiff had full range of motion in her cervical spine, without any paravertebral tenderness, muscle spasm, or trigger points. (*Id.*) There were full ranges of motion in the shoulders, elbows, forearms, wrists, and fingers. (*Id.*) She did not have any joint inflammation, effusion, instability, muscle atrophy, or sensory abnormalities in her upper extremities. (*Id.*) Plaintiff reported tenderness in her left wrist and lumbar spine. (*Id.*)

Dr. Shtock diagnosed the following: lower back pain, bilateral knee pain; reported history of bilateral wrist pain; reported history of asthma; status post Cesarean section; reported history of fibromyalgia; reported history of gastritis; reported history of headaches; and reported history of carpal tunnel syndrome. (AR at 277.) He provided that plaintiff had "mild to moderate" limitations for heavy lifting, squatting, kneeling, crouching, and sitting and standing for long periods. (*Id.*) Dr. Shtock specifically indicated she had moderate limitations for frequent stair climbing and walking long distances. (*Id.*) She also had mild limitations for frequent bending and using her hands for fine and gross manual activities due to left wrist weakness, tenderness, and pain. (*Id.*) However, plaintiff had no limitations performing overhead activities using both arms. (*Id.*)

On February 21, 2013, plaintiff visited Dr. Benatar due to pain in her left knee, left hip, left thigh, and wrists. (AR at 382.) The lateral ligaments of the left wrist were "exquisitely tender." (*Id.*) There also was clicking and patellofemoral pain in both knees. (*Id.*) Given these findings, Dr. Benatar continued plaintiff's prescriptions for Flexeril and Norco. (*Id.*)

Plaintiff was in a car accident on February 28, 2013. (AR at 337.) She spoke with her

5

primary care physician, Anthony Foto, D.O., on March 11, 2013. (*Id.*) Her complaints consisted of the following: mid- to lower-back pain, knee pain, bilateral shoulder pain, neck pain and stiffness, difficulty turning her head from side to side, and difficulty walking and bending. (AR at 337-38.) Examination revealed no neurological deficits. (AR at 337.) Dr. Foto diagnosed backache, muscle spasm, and rib sprain. (AR at 337-38.) He prescribed Lidoderm and Zomig for migraine headaches. (*Id.*)

On April 30, 2013, plaintiff complained to Dr. Benatar that she had back, neck, shoulder, and wrist pain. (AR at 381.) The left wrist was "especially symptomatic" that day. (*Id.*) Plaintiff stated that the anti-inflammatory Mobic, used daily, helped her. (*Id.*) She also took Norco. (*Id.*) Dr. Benatar noted that plaintiff had multiple joint problems, and that she would experience periodic swelling of both feet, ankles, elbows, and wrists. (*Id.*) Plaintiff also had chondromalacia in her left knee. (*Id.*) This was a "separate issue from her fibromyalgia." (*Id.*) Dr. Benatar concluded that she was "essentially disabled by this disease." (*Id.*)

Dr. Benatar assessed plaintiff's complaints of shoulder pain on June 13, 2013. (AR at 380.) The left shoulder showed a "marked reduction" in range of motion and tenderness. (*Id.*) Dr. Benatar also noted signs of impingement or tendinitis in the left shoulder. (*Id.*) He recommended exercises and stretches for plaintiff's shoulder. (*Id.*) Dr. Benatar renewed her prescriptions for Mobic and Norco. (*Id.*) Plaintiff was also instructed to return for a steroid injection if she felt it was necessary. (*Id.*)

On July 24, 2013, plaintiff stated the following to Dr. Foto: she had severe pain in her knees, back, wrist, and legs, more severe over the last two weeks, and she thought it was from her fibromyalgia. (AR at 339-40.) However, plaintiff was not in acute distress. (AR at 339.) Examination showed the following: no cyanoisis, clubbing, edema in the extremities, and pulses were normal. (*Id.*) There were no neurological deficits. (*Id.*) Both ribs were tender, and there was paraspinal muscle spasm. (*Id.*) Based upon these findings, Dr. Foto prescribed Medrol Dosepak. (AR at 340.)

On July 30, 2013, plaintiff first visited rheumatologist Stacy Slaven, M.D. (AR at 341-42.) Plaintiff indicated that she suffered from pain in her knees, hips, wrists, shoulders, neck, and lower back, as well as joint stiffness and some mild numbness and tingling in her fingers. (AR at 341.) She had stopped taking Cymbalta due to fatigue; she took Meloxicam, a nonsteroidal anti-inflammatory drug (NSAID), for her pain. (*Id.*) The examination indicated that plaintiff was not in any distress. (*Id.*) Lung and extremities examinations were normal. (*Id.*) She had intact strength and no focal weakness. (*Id.*) There were diffuse tender points in the bilateral upper back, anterior chest, lower back, and extremities. (*Id.*) There was tenderness in the shoulders and wrists, and crepitus in both knees. (*Id.*) There was no active synovitis or joint effusion. (*Id.*) Dr. Slaven diagnosed the following: pain in joint, multiple sites; backache, unspecified; other and unspecified nonspecific immunological findings; and myalgia and myositis, unspecified. (*Id.*) She recommended plaintiff continue Meloxicam. (AR at 342.) Plaintiff was instructed to go for further testing and imaging to see if, in addition to mechanical pain, there was an inflammatory connection. (AR at 341-42.)

On August 19, 2013, an MRI of plaintiff's spine revealed the following: mild degenerative disc change with trace right asymmetric ventral disc osteophyte complex

at C4-C5 and no disc herniation resulting in canal stenosis or neural impingement. (AR at 343, 355.)

Plaintiff underwent physical therapy for cervicalgia from August 21 through September 27, 2013 after complaining of neck, shoulder, wrist, knee, back, and thigh pain. (AR at 371-74.)

On August 28, 2013, Dr. Benatar noted that, after plaintiff's February 2013 car accident, she complained of pain in her right shoulder, neck, and left knee. (AR at 379.) Reportedly, a lumbar MRI revealed degenerative changes with facet joint arthropathy. (*Id.*) X-rays of the left-shoulder and both wrists and hands were normal. (*Id.*) X-rays of the cervical spine showed degenerative changes. (*Id.*) As a result, Dr. Benatar prescribed Hydrocodeine and recommended shoulder MRIs. (*Id.*)

Electrodiagnostic testing performed on August 29, 2013, showed no dysfunction in plaintiff's cervical spine or bilateral upper extremities. (AR at 375-77.)

On August 29, 2013, a left shoulder MRI showed the following: moderate to high-grade articular sided partial-thickness tear of the supraspinatus tendon; low-grade intrasubstance delaminating partial-thickness tear of the supraspinatus tendon; and a mild edema in the distal clavicle, possibly degenerative as there was mild acromioclavicular (AC) joint osteoarthrosis. (AR at 344.)

A right shoulder MRI performed on September 4, 2013, revealed the following: mild rotator cuff tendinosis, with minimal superior surface fraying on the supraspinatus tendon, and minimal AC joint arthrosis. (AR at 345-46.)

On September 20, 2013, a left knee MRI showed the following: joint effusion, proximal patellar tendinosis, and a fissure through the medial patellar cartilage. (AR at 347.) There was no evidence of meniscal or ligament tears. (*Id.*)

A right knee MRI performed on September 24, 2013, displayed an increasing focal signal abnormality as compared to 2010 and 2011 MRIs. (AR at 348-49.) There was also small to moderate joint effusion but no thickened plica. (AR at 348.)

On September 24, 2013, Dr. Slaven completed a residual functional capacity form. (AR at 350-54, 356, 358-64.) She indicated that she had seen plaintiff on July 30, 2013, for an initial consultation. (AR at 350.) Dr. Slaven diagnosed the following: mechanical neck/back pain, left shoulder tendonitis, and possible inflammatory arthritis. (*Id.*) According to plaintiff, the pain occurred daily. (AR at 353.) Dr. Slaven concluded that plaintiff was unable to "stand and/or sit upright for at least six hours" per day as "joint and neck/back pain was exacerbated with extended standing or sitting." (AR at 350-52.) Plaintiff could stand for thirty minutes at one time and walk non-stop for approximately fifteen to thirty minutes. (*Id.*) Dr. Slaven noted that plaintiff could rarely (with 0 to 30% frequency) reach in any direction or handle objects with her hands and fingers. (AR at 352.) Plaintiff could lift five to ten pounds and carry less than five pounds; activities such as lifting/pulling exacerbated joint pain. (AR at 353.) Dr. Slaven did not state that plaintiff had difficulty bending, squatting, or kneeling. (*Id.*) Plaintiff did suffer from pain in the left shoulder and both wrists. (*Id.*) Dr. Slaven further noted that plaintiff could not continue or resume work at her previous employment. (AR at 354.) Moreover, Dr.

Slaven concluded that plaintiff's disability was not likely to change. (*Id.*)

On September 27, 2013, plaintiff saw Dawne Kort, M.D., due to complaints of back pain. (AR at 366-70.) Dr. Kort diagnosed back strain/back spasm. (AR at 366.) She also administered a Toradol injection, prescribed Flexeril, and stated that plaintiff should rest and follow up with her primary care physician. (AR at 366-67.)

### 3. Additional Medical Evidence Submitted to the Appeals Council

Plaintiff submitted additional evidence to the Appeals Council. This evidence included four treatment notes from internist Priti Patel, M.D., dating from February 9, 2009 to July 17, 2010. (AR at 386-97.) These treatment notes showed that plaintiff principally complained of right knee pain. (*Id.*) On November 21, 2009, Dr. Patel noted that plaintiff was still able to perform activities of daily living and work. (AR at 394.) During this time, the right knee revealed no deformity, swelling, or limitation in range of motion. (AR at 396.) Movement and palpation were painful. (*Id.*) Gait, sensation, and muscle strength were normal. (*Id.*) Examination findings were essentially the same on April 27, 2010. (AR at 392.) Plaintiff requested that Dr. Patel complete a disability form and prescribe pain medication, but Dr. Patel referred her to an orthopedist, with whom plaintiff did not follow up. (AR at 390.) On July 17, 2010, plaintiff was ambulating without assistance and was able to sit comfortably on the examination table with no signs of pain. (AR at 388.) Examination of plaintiff's back revealed no limitation on range of motion; however, movements were painful and there was tenderness of the paravertebral muscles. (*Id.*) There was no swelling or atrophy of the right knee. (*Id.*) Ranges of motion were painful, and the knee was tender to palpation. (*Id.*) Sensation and muscle strength were full (5/5) throughout; reflexes were equal and symmetric. (*Id.*) Gait was normal. Plaintiff was instructed to follow up with her orthopedist and rheumatologist. (AR at 389.)

Dr. Slaven submitted a Medical Source Statement, dated March 13, 2014, as part of plaintiff's additional evidence to the Appeals Council. (AR at 399-401.) Dr. Slaven diagnosed the following conditions: chronic neck and back pain, chronic pain syndrome/fibromyalgia, and possible inflammatory arthritis. (AR at 399.) Dr. Slaven opined that plaintiff could only sit for two hours in a work day, stand/walk for one hour, and occasionally lift and carry up to nine pounds. (AR at 400.) She could occasionally balance and kneel, but never climb, stoop, crawl, crouch, push/pull, or bend/twist. (*Id.*) However, plaintiff could drive continuously. (*Id.*) She could occasionally handle, finger, and reach. (AR at 401.) Dr. Slaven also indicated that she had first seen plaintiff in July 2013, but plaintiff had noted having symptoms in 2009. (*Id.*)

### 4. Plaintiff's Testimony at the Administrative Hearing

On October 10, 2013, plaintiff testified at a hearing before an ALJ. Plaintiff testified that since 2008 she suffered from the following impairments: fibromyalgia, arthritis, tendonitis, and tears in both of her shoulders and wrists. (AR at 39-40, 42.) She claimed that these impairments have limited the things she could do. (AR at 40.) "Every day," she experienced pain either in her wrists, knees, neck, back, or shoulders. (AR at 40, 42.) When asked how often she experiences the pain, she stated "everyday something is hurting [her]." (AR at 40.) She testified it has gotten "very much worse" since she first experienced it in 2008. (AR at

42.) During the hearing, plaintiff testified that she had pain in both knees, the right wrist, back, and neck. (AR at 53.) Plaintiff took Neurotin, Norco, Mobic, and Flexeril. (AR at 41.) She indicated they made her tired throughout the day. (AR at 54.) She used a heating pad on "anything that is hurting." (AR at 40.) She did not use a cane or wear a back brace; she had wrist and knee braces. (AR at 51-53.) Plaintiff testified she could "barely walk" without the knee braces. (AR at 52.) She stated she had also been going to physical therapy for three or four years. (AR at 41.) She stated that neither the medication nor therapy had helped. (AR at 41.) Plaintiff testified she had a "lot of problems" climbing stairs because it hurt her back and knees; it took a long time, and she had to lean on the wall. (AR at 48-49.)

Plaintiff testified that her husband worked from 5:30 a.m. to approximately 3:30 p.m. (AR at 43-44.) Her in-laws lived upstairs. (AR at 45-46.) Plaintiff got her five-year-old son up and off to school in the morning, and drove him to the bus stop, but stated that this activity "causes pain." (AR at 40.) She stated that her husband did "most" of the household shopping, all of the cleaning, and cared for their son when he got home from school. (AR at 42.) Plaintiff also indicated that her mother-in-law washed all of the laundry, and her father-in-law did all of the cooking. (AR at 45-46.) Plaintiff testified that she "occasionally" shopped for food, sometimes folded the laundry, and occasionally washed the dishes while sitting down. (AR at 45, 47.) She "sometimes" went out to restaurants with her family, and occasionally went to the bank and post office. (AR at 48-49.) Plaintiff also testified she had driven herself to the hearing. (AR at 48.) The past year she went to North Carolina to visit her mother. (AR at 49-50.) She used a computer to research and send emails. (AR at 50.) She went out to get her nails done. (AR at 47.) Plaintiff stated that she could hold a cup of coffee, use a knife and fork, and open a car door. (AR at 49.) She indicated that she had no difficulty filling out forms. (AR at 51.) Plaintiff further estimated she "could not lift more than ten pounds" and that the pain in her right wrist (the hand she uses to write) is "overall, at a 9" out of 10. (AR at 53.)

B.  Procedural History

On September 28, 2012, plaintiff filed an application for disability insurance benefits, claiming she was disabled since February 18, 2012, due to the following: fibromyalgia; irritable bowel syndrome; interstitial cystitis; arthritis; obesity; and pain in her back, knee, and wrist. (AR at 97-98, 111.) On January 9, 2013, the application was denied (AR at 67), and she requested a hearing before an ALJ. (AR at 71.) Plaintiff's hearing was held before ALJ Seymour Rayner on October 10, 2013. (AR at 36-56.) In a decision dated January 10, 2014, the ALJ found plaintiff not disabled. (AR at 18-35.) On March 31, 2014, plaintiff requested review from the Appeals Council and also sought to amend the disability onset date from February 28, 2012 to April 1, 2011. (AR at 213.) On May 4, 2015, the Appeals Council denied plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (AR at 1-7.) This action followed.

II.  STANDARD OF REVIEW

A district court may set aside a determination by an ALJ "only if it is based upon legal error or if the factual findings are not supported by substantial evidence in the record as a whole." *Greek v. Colvin*, 802 F.3d 370, 374-75 (2d Cir. 2015) (citing *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008); 42 U.S.C. § 405(g)). The Supreme Court has defined "substantial evidence" in Social

Security cases to mean "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted); *see Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013). Furthermore, "it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, "even if [the court] might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (internal citation and quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner.").

### III. DISCUSSION

#### A. The Disability Determination

A claimant is entitled to disability benefits if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520, 416.920. The Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996) (internal quotation marks omitted)). The claimant bears the burden of proof with respect to the first four steps; the Commissioner bears the burden of proving the last step. *Id.*

The Commissioner "must consider" the following in determining a claimant's entitlements to benefits: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience," *Id.* (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (internal quotation marks omitted)).

B. Analysis

According to plaintiff, the ALJ erred by: (1) failing to support his determination of plaintiff's residual functional capacity with substantial evidence; and (2) failing to apply the correct legal standards for determining what severe impairments plaintiff had, and whether plaintiff met a listed impairment. Plaintiff also contends that the ALJ: (1) failed to support his decision with substantial evidence; (2) failed to follow agency regulations; (3) failed to apply the correct legal standards; and (4) overlooked or rejected persuasive proof that plaintiff is disabled. As set forth below, the Court concludes that the ALJ failed to properly consider Dr. Slaven's opinions under the treating physician rule, and also failed to properly assess the factors for determining what weight to give those opinions. The Court remands for these reasons.

1. The ALJ's Decision

In concluding that plaintiff was not disabled under the SSA, the ALJ adhered to the five-step sequential analysis for evaluating applications for disability benefits. (AR at 21-30.)

a. Substantial Gainful Activity

At step one, the ALJ must determine whether the claimant is presently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity is work activity that involves doing significant physical or mental activities," *id.* § 404.1572(a), and gainful work activity is work usually done for pay or profit, *id.* § 404.1572(b). Individuals who are employed are engaging in substantial gainful activity.

Here, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the initial alleged onset date of February 18, 2012 through her date last insured of December 31, 2012. (AR at 23.) Substantial evidence supports this finding, and plaintiff does not challenge its correctness. (Pl. Br. at 2.)

b. Severe Impairment

At step two, if the claimant is not employed, the ALJ determines whether the claimant has a "severe impairment" that limits her capacity to work. An impairment or combination of impairments is "severe" if it significantly limits an individual's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1520(c); *see also Perez*, 77 F.3d at 46.

Here, the ALJ found that plaintiff had the following severe impairments: fibromyalgia; arthritis of the lower back and both knees; tendinosis of the right wrist; and

11

tenosynovitis of the left wrist. (AR at 23.) The ALJ found that "there is no evidence of medically determinable shoulder impairment(s) until MRI studies in August and September 2013." (AR at 23, 345-47.) The ALJ further found that "while medically determinable impairments, there is no evidence in the record that irritable bowel disease or obesity resulted in more than minimal limitations in the claimant's ability to perform basic work-related physical activities through the date last insured and therefore, these impairments are found not to be severe." (AR at 23.)

Plaintiff challenges the ALJ's determination that there was "no evidence of a medically determinable shoulder impairment" prior to the date last insured and that plaintiff's obesity resulted in only "minimal" limitations to her ability to perform basic work-related physical activities before the date last insured. (AR at 23; Pl. Br. at 4.) As a threshold matter, the Court notes that the ALJ should have provided a more detailed explanation of his decision as to why plaintiff's other medical conditions did not constitute severe impairments. It is difficult to undertake a meaningful review where there is only a conclusory sentence in support of the non-severe finding, which does not indicate the reasoning underlying the decision. However, the Court finds no reversible error with regard to the ALJ's assessment of plaintiff's impairments because the ALJ identified other severe impairments at step two of the analysis so that plaintiff's claim proceeded through the sequential evaluation process, and in those subsequent steps, the ALJ considered plaintiff's claims of shoulder and obesity impairments in addition to her other impairments. Specifically, the ALJ indicated that he considered the "entire record." (AR at 24.) *See Viverito v. Colvin*, 2016 WL 755633, at *9 (E.D.N.Y. Feb. 25, 2016) (finding no reversible error committed when ALJ excluded hearing loss and gastrointestinal impairments as severe because ALJ identified other severe impairments and considered hearing loss and gastrointestinal impairments in subsequent steps); *see also Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (finding any error by ALJ in excluding claims of anxiety disorder and panic disorder from step two of analysis would be harmless because ALJ identified other severe impairments and specifically considered the claims of anxiety and panic attacks in subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233 n.1 (2d Cir. 2010) (finding remand would not be warranted due to ALJ's failure to recognize disc herniation as a severe impairment because "the ALJ did identify severe impairments at step two, so that [plaintiff's] claim proceeded through the sequential evaluation process" and ALJ considered the "combination of impairments" and "all symptoms" in making determinations).

c. Listed Impairments

At step three, if the claimant has a severe impairment, the ALJ next considers whether the claimant has an impairment that is listed within Appendix 1 of the regulations. When the claimant has such an impairment, the ALJ will find the claimant disabled without considering the claimant's age, education, or work experience. 20 C.F.R. § 404.1520(d).

Here, the ALJ found that none of plaintiff's impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR at 23.) Although plaintiff has not contended that any of her impairments fall under 20 C.F.R. Part 404, Subpart P, Appendix 1, plaintiff does argue that remand is necessary because the

ALJ "provided no explanation to support his assertion that plaintiff did not meet or equal a listing; he simply recited the criteria of 1.02 and 1.04, and stated there is no evidence for either." (Pl. Br. 5-6.) As a threshold matter, the Court notes that the ALJ should have provided a more detailed explanation of his decision as to why plaintiff "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.152(6))." (AR at 24.) However, the Court finds no reversible error with regard to the ALJ's assessment of plaintiff's impairments under Appendix 1 because while "[t]he ALJ must justify this determination with more than a brief conclusory statement" that the claimant does not meet the listings, *McHugh v. Astrue*, No. 11-CV-00578 (MAT), 2013 WL 4015093, at *6 (W.D.N.Y. Aug. 6, 2013), "the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them 'so long as we are able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence.'" *See Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010) (summary order) (quoting *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)). Here, the ALJ's rationale at step three is not something the Court would be "unable to fathom," *id.* at 469, and is supported by other portions of the ALJ's decision, along with plaintiff's own testimony, notwithstanding the fact that the ALJ could have been more specific during the step three analysis.

d. Residual Function Capacity and Past Relevant Work

If the severe impairments do not meet or equal a listed impairment, the ALJ assesses the claimant's residual function capacity "based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). The ALJ then determines at step four, whether, based on the claimant's residual function capacity ("RFC"), the claimant can perform her past relevant work. *Id.* § 404.1520(f). When the claimant can perform her past relevant work, the ALJ will find that she is not disabled. *Id.*

Here, the ALJ determined that plaintiff was unable to perform her past relevant work, which was "light" work, but found her capable of "the full range of sedentary work." (AR at 24, 29.) In reaching this conclusion, the ALJ relied upon the findings from the following sources: plaintiff's orthopedic consultation with Dr. Chaim Shtock who examined plaintiff for the Social Security Administration on December 5, 2012; a report of consultation with Dr. Anang Modi of the Queens Long-Island Medical Group on November 5, 2012; a report of consultation with Dr. Waseem Mir of New York Integrative Rheumatology & Arthritis Care on October 30, 2012; MRI studies in 2011 and 2012; and x-rays of the lumbosacral spine and the left knee in December 2012. (AR at 24-25.)

The ALJ noted that plaintiff claimed at the hearing that she had been recently diagnosed with fibromyalgia but "ha[d] been suffering with its effects since 2008." (AR at 28.) He noted that she claimed it causes pain in both of her wrists, knees, back and shoulders and hurts "everyday" and that she used a heating pad and was prescribed medications including Neurontin, Gabipentin, Norco and Mobic. (*Id.*) The ALJ also indicated that plaintiff testified she had arthritis, tendonitis and tears in her shoulder. (*Id.*) The ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms;" but

13

that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not persuasive as they were not supported by the weight of the medical evidence." (AR at 28.)

The ALJ described plaintiff's medical history, as stated in the record, based upon the above sources. (AR at 25-29.) Specifically, the ALJ noted that, based upon Dr. Shtock's examination of plaintiff on December 5, 2012, plaintiff appeared to be "in no acute distress" and that "she could walk on heels and toes without difficulty but was unable to squat beyond 30% capacity due to knee pain." (AR at 25.) Range of motion in the shoulders, elbows, forearms, wrists and fingers was full bilaterally, and there was no joint inflammation, effusion, or instability. (*Id.*) There was also full range of motion of the hips and ankles bilaterally despite some swelling. (*Id.*) The ALJ furthered noted that plaintiff informed Dr. Shtock that she is "independent" in various tasks including cooking, cleaning, laundry, shopping, showering, dressing and grooming; and watches television and listens to the radio contrary to her testimony at the hearing. (*Id.*) The ALJ then noted that similar findings were made by Dr. Waseem Mir during his rheumatologic consultation with plaintiff on October 30, 2012, who concluded "there was full range of motion of all joints" and the "extremities revealed no deformities." (*Id.*) The ALJ concluded that, based upon a consultation with Dr. Anang Modi of the Queens-Long Island Medical Group, performed at the request of both Dr. Foto and Dr. Benatar on November 5, 2012, plaintiff had "pain localized to one or more joints with localized swelling" and "no motor disturbances." (*Id.*) As a result, the ALJ found that on three of the last examinations performed prior to the expiration of insured status on December 31, 2012, "physical examination findings were essentially unremarkable." (AR at 26.) The ALJ also noted that an examination by Karen A. Montebello, RPA-C, on July 31, 2012, revealed plaintiff was in "no acute distress." (*Id.*) The ALJ then explained that "a great deal" of the medical evidence in the record relates to the claimant's impairments after the date last insured such as various MRIs in 2013, but that there was also MRI evidence of plaintiff's impairments prior to the date last insured. (*Id.*) The ALJ next mentioned reports from Dr. Anthony Foto, addressing examinations in March and July of 2013, noting that they occurred several months after the expiration of insured status. (AR at 27.) The ALJ explained that, while progress reports from Dr. Benatar covering the period of August 2008 to November 27, 2012 do provide multiple complaints of pain, "no physical limitations" besides plaintiff's difficulty, kneeling, squatting, sitting down, and arising from a seated position were mentioned. (*Id.*) Finally, the ALJ took notice of a January 18, 2012 progress note from Dr. Benatar indicating that plaintiff "was disabled by her injury: she cannot kneel; she cannot squat; and she has difficulty standing and walking." (*Id.*) However, the ALJ found that this "would not preclude" plaintiff from performing sedentary work. (*Id.*)

The ALJ found that, as for the opinion evidence submitted by plaintiff, "great weight" is given to Dr. Shtock, a consulting physician who performed a comprehensive examination for the Social Security Administration on December 5, 2012, albeit with the exception of his opinion regarding mild-to-moderate limitation with sitting long periods, since "this is not supported by the medical evidence in the record." (AR at 29.) The ALJ also gave "great weight" to Dr. Benatar's opinion "that the claimant cannot kneel or squat and has difficulty standing and walking." (*Id.*) The ALJ found that Dr.

Benatar's opinion is "consistent with other medical evidence in the record." (*Id.*)

The ALJ articulated that his residual functional capacity assessment was "supported by objective medical evidence," other evidence "based on the requirements of 20 CFR 404.1529 and SRRs 96-4p and 96-7p," and "opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (AR at 27.) In assessing plaintiff's RFC, the ALJ proceeded in following the two-step process: (1) he decided "whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms;" (2) he "evaluate[d] the intensity, persistence and limiting effects of the claimant's symptoms to determine the extent to which they limit plaintiff's functioning," after "an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown." (AR at 27-28.) Specifically, the ALJ found that as far as plaintiff's claim that she could not sit for more than 10 minutes, there is "little objective medical evidence to support this claim" and "that while it is understandable that her knee and back problems may prevent her from performing activities requiring prolonged standing or walking; frequent bending and kneeling or squatting at all, there is no medical basis for finding that she has any limitations in sitting and would be unable to sit for up to 6 hours during an 8-hour workday, allowing for normal breaks, and to occasionally stand/walk in between sitting." (AR at 28-29.) Finally, the ALJ explained that plaintiff stated to Dr. Shtock that she participates in a "fairly broad range of activities including being independent in cooking, cleaning, laundry, shopping, showering and dressing," while denying doing many of these things at the hearing and attributing them to other people. (AR at 29.)

Plaintiff challenges the ALJ's assessment of her residual functional capacity. For the reasons explained *infra*, the Court finds that the ALJ failed to properly consider Dr. Slaven's medical opinions in making this determination[2] and also failed to properly assess the factors for determining what weight to give those opinions.

e. Other Work

At step five, if the claimant is unable to perform her past relevant work, the ALJ determines whether the claimant is capable of adjusting to performing any other work. 20 C.F.R. § 404.1520(g). To support a finding that an individual is not disabled, the Commissioner has the burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform. *Id.* § 404.1560(c). In this case, the ALJ considered plaintiff's age, education, work experience, and residual functional capacity, in connection with the Medical-Vocational Guidelines set forth at Appendix 2 of Part 404, Subpart P of Title 20 of the Code of Federal Regulations, and found that plaintiff

---

[2] To the extent that plaintiff argues that the ALJ failed to consider all of her impairments in assessing her residual functional capacity, the Court disagrees. The ALJ noted plaintiff's medical history and impairments including that of shoulder impairment(s) and obesity (AR at 23), and indicated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence" in making his determination (AR at 27). Nonetheless, the Court finds that the ALJ's assessment of plaintiff's residual functional capacity still warrants remand due to the failure to follow the treating physician rule, as discussed *infra*.

has the ability to perform a significant number of jobs in the national economy. (AR at 30.)

Plaintiff argues that the ALJ erred at step five by exclusively relying on the "grids" to determine whether plaintiff could perform any work, noting that "exclusive reliance on the grids is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations," *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999), and argues that Dr. Slaven's opinion identified additional limitations (on plaintiff's ability to stoop at work (AR at 400)) that are not incorporated in the grids. For the reasons discussed below, the ALJ failed to properly apply the treating physician rule to Dr. Slaven's opinion at step four. Thus, the ALJ's failure to do so at step five also constitutes an additional ground for remand based upon exclusive reliance on the "grids" without considering Dr. Slaven's opinions.

2. Treating Physician Rule

Plaintiff argues, among other things,[3] that the ALJ and Appeals Council failed to follow the treating physician rule because the ALJ did not consider, or even mention, Dr. Slaven's opinion when assessing plaintiff's residual functional capacity. The Court agrees that the ALJ failed to apply the proper standard for evaluating the medical opinion of Dr. Slaven and remands the case on this basis.

a. Legal Standard

The Commissioner must give special evidentiary weight to the opinion of a treating physician. *See Clark*, 143 F.3d at 118. The "treating physician rule," as it is known, "mandates that the medical opinion of a claimant's treating physician [be] given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *see also, e.g.*, *Rosa v. Callahan*, 168 F.3d 72, 78-79 (2d Cir. 1999); *Clark*, 143 F.3d at 118. The rule as set forth in the regulations, provides:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically

---

[3] Plaintiff also argues that the ALJ failed to properly assess her credibility. (Pl. Br. at 22.) Specifically, plaintiff contends that the ALJ erroneously concluded that plaintiff claimed an "inability to sit for more than 10 minutes" at a time. (Pl. Br. at 22; AR at 28.) Relatedly, and more generally, plaintiff argues that the ALJ failed to consider the factors in 20 C.F.R. 404.1529(c)(3) and SSR 96-7p when evaluating plaintiff's testimony. The Court need not consider this issue given the remand on other grounds (namely, the ALJ's failure to adhere to the treating physician rule). However, the Court directs the ALJ on remand to reconsider plaintiff's testimony, after properly applying the treating physician rule, in light of all the factors in 20 C.F.R. 404.1529(c)(3).

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(c)(2).

Although treating physicians may share their opinions concerning a patient's inability to work and the severity of the disability, the ultimate decision of whether an individual is disabled is "reserved to the Commissioner." *Id.* § 404.1527(d)(1); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability.").

When the Commissioner decides that the opinion of a treating physician should not be given controlling weight, she must "give good reasons in [the] notice of determination or decision for the weight [she] gives [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see also Perez v. Astrue*, No. 07-CV-958 (DLJ), 2009 WL 2496585, at *8 (E.D.N.Y. Aug. 14, 2009) ("Even if [the treating physician's] opinions do not merit controlling weight, the ALJ must explain what weight she gave those opinions and must articulate good reasons for not crediting the opinions of a claimant's treating physician."); *Santiago v. Barnhart*, 441 F. Supp. 2d 620, 627 (S.D.N.Y. 2006) ("Even if the treating physician's opinion is contradicted by substantial evidence and is thus not controlling, it is still entitled to significant weight because the treating source is inherently more familiar with a claimant's medical condition than are other sources." (internal citation and quotation marks omitted)). Specifically, "[a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). "Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for a remand." *Snell*, 177 F.3d at 133.

"Furthermore, the ALJ has the duty to recontact a treating physician for clarification if the treating physician's opinion is unclear." *Stokes v. Comm'r of Soc. Sec.*, No. 10-CV-0278 (JFB), 2012 WL 1067660, at *11 (E.D.N.Y. Mar. 29, 2012) (quoting *Ellett v. Comm'r of Soc. Sec.*, No. 1:06-CV-1079 (FJS), 2011 WL 1204921, at *7 (N.D.N.Y. Mar. 29, 2011) (internal quotation marks omitted)); *see also Calzada v. Astrue*, 753 F. Supp. 2d 250, 277 (S.D.N.Y. 2010) ("If the ALJ is not able to fully credit a treating physician's opinion because the medical records from the physician are incomplete or do not contain detailed support for the opinions expressed, the ALJ is obligated to request such missing information from the physician."); *Mitchell v. Astrue*, No. 07-CV-285 (JSR), 2009 WL 3096717, at *17 (S.D.N.Y. Sept. 28, 2009) ("If the opinion of a treating physician is not adequate, the ALJ must 'recontact' the treating physician for clarification." (citing 20 C.F.R. §§404.1512(e), 416.912(e))). Such an obligation is linked to the ALJ's affirmative

17

duty to develop the record. *See Perez*, 77 F.3d at 47.

### b. Analysis

The Court finds that the ALJ failed to apply the proper standard for evaluating the opinion of Dr. Slaven, the treating physician, who initially examined plaintiff on July 30, 2013, and concluded plaintiff's symptoms started in 2009 (during the period before the date last insured). (AR at 341, 401.)

The Commissioner correctly notes that Dr. Slaven did not examine plaintiff until seven months after the date last insured (AR at 341), and that plaintiff was involved in a car accident after the relevant period (AR at 379). Furthermore, the Commissioner is correct in the assertion that a physician's opinion may potentially be entitled to less weight if the examination occurred after the date last insured and no connection is made between the recent diagnosis and plaintiff's condition during the date last insured. *See Vilardi v. Astrue*, 447 F. App'x 271 (2d Cir. 2012) (finding plaintiff's reliance on medical evidence demonstrating a worsening of her condition after the date last insured was of "little value"); *Behling v. Comm'r of S.S.A.*, 369 F. App'x 292 (2d Cir. 2010) (holding new impairments arising after the date last insured are not relevant). However, even if Dr. Slaven did not treat plaintiff during the period prior to plaintiff's date last insured, that fact alone does not show that Dr. Slaven's opinion warrants no consideration or weight. *See Wenk v. Barnhart*, 340 F. Supp. 2d 313, 322 (E.D.N.Y. 2004) (holding that the treating physician rule, under which medical opinions of treating physicians are given controlling weight in Social Security disability cases, applies to retrospective diagnoses, which relate to some prior time period during which the diagnosing physician may or may not have been a treating source); *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (holding that, although the doctor did not treat claimant for Social Security disability benefits during relevant period prior to date claimant last met the earnings requirement, the doctor's opinion was still entitled to "significant weight"). Moreover, opinions of treating physicians are "binding in the absence of substantial evidence to the contrary even if the treating physician[s'] evaluations [were] made after the last date on which the claimant met the special earnings requirement." *Henningsen v. Comm'r of S.S.A.*, 111 F. Supp. 3d 250, 267 (E.D.N.Y. 2015) (quoting *Allan v. Sec. of HHS*, No. 87-civ-1322C, 1989 WL 280263, at *4-5 (W.D.N.Y. Sept. 15, 1989) (alterations in original) (internal quotation marks omitted)). Further, this Court has held that when the ALJ fails to state the amount of weight he gave to a treating physician's opinion remand is required. *Branca v. Comm'r of SSA*, No. 12-CV-643 (JFB), 2013 WL 5274310, at *12 (E.D.N.Y. Sept. 18, 2013) (remanding when the ALJ erred by "failing to explain the weight he assigned to the opinions of plaintiff's treating physicians and failing to properly assess the factors for determining what weight to give those opinions"); *Torres v. Comm'r of S.S.A.*, No. 13-CV-330 (JFB), 2014 WL 69869, at *1, *9 (E.D.N.Y. Jan. 9, 2014); *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 265-68 (E.D.N.Y. 2010) (finding remand was warranted when the ALJ did not "explicitly" apply and weigh the various factors that must be considered in determining how much weight to give an opinion of a treating physician).

The Court finds that the ALJ failed to apply the proper standard for evaluating the opinion of Dr. Slaven because he did not even mention Dr. Slaven in his opinion (AR at 21-30), notwithstanding that during plaintiff's summation at the hearing before the ALJ, plaintiff's attorney stated that Dr. Slaven was

18

plaintiff's "treating physician" (AR at 55). Because the ALJ failed to evaluate Dr. Slaven's opinion under the treating physician rule and failed to address the factors set out in 20 C.F.R. § 404.1527(d)(2), remand is necessary.

Further, to the extent that the Commissioner argues that the ALJ was correct in not assigning significant weight to Dr. Slaven's opinion because (1) it was made after plaintiff's date last insured; (2) it does not relate to the relevant period; and/or (3) plaintiff was in a car accident during the period she saw Dr. Slaven, so plaintiff's medical conditions changed, thereby making Dr. Slaven's opinion irrelevant, these arguments are impermissible *post hoc* rationalizations by the Commissioner, as evidenced by the fact that the ALJ never even mentioned Dr. Slaven's name in his decision, let alone offered these explanations for discounting Dr. Slaven's opinion. *See Losquadro v. Astrue*, No. 11-CV-1798 (JFB), 2012 WL 4342069, at *15 (E.D.N.Y. Sept. 21, 2012) (citing *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962) (holding that "a reviewing court 'may not accept appellate counsel's *post hoc* rationalizations for agency action'")); *see also Snell*, 177 F.3d at 134;

*Newbury v. Astrue*, 321 F. App'x 16, 18 (2d Cir. 2009). Thus, the Court disagrees with the Commissioner's assertion that Dr. Slaven's opinion was "irrelevant in determining plaintiff's limitations during the period at issue in this case," and that "the ALJ properly focused his consideration on plaintiff's functioning prior to and up to her date last insured for disability benefits, December 31, 2012." (Def. Br. at 34.) None of the points articulated by the Commissioner were identified by the ALJ as a basis for his refusal to give Dr. Slaven's opinion controlling weight or for his failure to even mention Dr. Slaven's opinion at all. Such *post hoc* rationalizations are insufficient, as a matter of law, to bolster the ALJ's decision. *Demera v. Astrue*, No. 12-CV-432 (FB), 2013 WL 391006, at *3 n.3 (E.D.N.Y. Jan. 24, 2013) (holding that the Commissioner's "*post hoc* rationalizations for the ALJ's decision are not entitled to any weight").

Thus, in light of the ALJ's failure to assess Dr. Slaven's opinion under the treating physician rule and the factors set out in 20 C.F.R. § 404.1527(d)(2), the Court concludes that remand is necessary so that the ALJ can properly consider Dr. Slaven's opinion.[4]

---

[4] Plaintiff also argues that the Appeals Council failed to consider additional evidence (namely, a Medical Source Statement, which provided updated and more detailed medical information) that Dr. Slaven submitted following the ALJ's decision. Although the Appeals Council acknowledged that it had received Dr. Slaven's submission and included it in the record (*see* AR at 6), it did not explicitly address this additional documentation in rendering its conclusion that there was "no reason" to review the ALJ's decision (AR at 1). The failure to do so constitutes a further ground for remand. *See Glessing v. Comm'r of Soc. Sec.*, No. 13-CV-1254(BMC), 2014 WL 1599944, at *14 (E.D.N.Y. Apr. 21, 2014) (finding remand warranted where Appeals Council listed physician's letter among additional evidence received and made part of the record, but merely stated that the newly submitted information did "not provide a basis for changing the Administrative Law Judge's decision"); *see also James v. Comm'r of Soc. Sec.*, No. 06-CV-6108 (DLI/VVP), 2009 WL 2496485, at *11 (E.D.N.Y. Aug. 14, 2009); *Toth v. Colvin*, No. 5:12-CV-1532 (NAM/VEB), 2014 WL 421381, at *6 (N.D.N.Y. Feb. 4, 2014). "[W]here newly submitted evidence consists of findings made by a claimant's treating physician, the treating physician rule applies, and the Appeals Council must give good reasons for the weight accorded to a treating source's medical opinion." *James*, 2009 WL 2496485, at *10. Contrary to the Commissioner's argument that detailed analysis is not required in denial notices issued by the Appeals Council, the treating physician rule nonetheless applies and requires that good reason be provided for disregarding a treating physician's opinion. *See Glessing*, 2014 WL 1599944, at *14 (remanding for failure to provide rationale for disregarding newly submitted evidence of treating physician's opinion in Appeals Council's denial of request for review); *Toth*,

## IV. CONCLUSION

For the reasons set forth above, the Commissioner's cross-motion for judgment on the pleadings is denied. Plaintiff's motion for judgment on the pleadings is denied, but plaintiff's motion to remand is granted. The case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 9, 2016
Central Islip, NY

\*\*\*

Plaintiff is represented by Jeffrey Delott, of the Law Offices of Jeffrey Delott, 366 North Broadway, Suite 410, Jericho, NY 11753. The Commissioner is represented by Candace Scott Appleton, United States Attorney, Eastern District of New York, 271 Cadman Plaza East, 7th Floor, Brooklyn, New York, 11201.

---

2014 WL 421381, at \*6 (same). Thus, on remand, the ALJ should also consider Dr. Slaven's Medical Source Statement and evaluate it in accordance with the treating physician rule.